### GENERAL BAKING CO. v. GORMAN.

(District Court, D. Rhode Island. January 19, 1924.)

No. 168.

1. Trade-marks and trade-names and unfair competition ⚖⇒59(5)—"Liberty Bond," as a name for bread, held not an infringement of the trade-mark "Bond."

"Liberty Bond," adopted as a name for bread, accompanied on the wrappers by a conspicuous picture of the Statue of Liberty and the name of the maker, is not so similar to the trade-mark "Bond" for bread as to constitute an infringement per se.

**2. Trade-marks and trade-names and unfair competition ⬤ᵒ31—Right in trademark used only locally is limited territorially by extent of business.**

There is no property in a trade-mark except as a right appurtenant to an established business or trade in connection with which it is used, and where such use has been only local, the right cannot be asserted in a territory to which the trade has never been extended, as against another who has in good faith and without knowledge of such use adopted the same or a similar mark in that territory.

**3. Trade-marks and trade-names and unfair competition ⬤ᵒ57—Finding the same word in two trade-marks does not establish the fact that it is the "dominant feature."**

While a part of a trade-mark may be so significant or conspicuous as to make it the "dominant feature" imitation of which is in effect imitation of the entire mark, the finding of a similar word in two trademarks does not establish the fact that it is a dominant feature.

**4. Trade-marks and trade-names and unfair competition ⬤ᵒ59(5)—Trade-mark held not infringed.**

Complainant, which operated a number of bakeries in different states, including one in Rhode Island, adopted the name "Bond" as a trade-mark for its bread, which it used in certain localities but not in Rhode Island, where its bread was sold under different names. Three and one-half years after defendant, a local baker who served two adjoining cities in Rhode Island, began the use of the name "Liberty Bond" on his bread, in 1917, complainant began the making and advertising of a new bread for the Rhode Island trade to which it applied the name "Bond Bread," with a guaranty bond of quality printed on the wrapper. Defendant, at the time he adopted the name "Liberty Bond," had no knowledge of the previous use of the name "Bond" by complainant. *Held*, that he was not chargeable with infringement of complainant's trade-mark.

In Equity. Suit by the General Baking Company against James H. Gorman. Bill dismissed.

Duell, Warfield & Duell, of New York City, and William H. Thornley, of Providence, R. I., for plaintiff.

Fitzgerald & Higgins, of Providence, R. I., for defendant.

BROWN, District Judge. The General Baking Company charges that the defendant, James H. Gorman, by the use of the trade-mark "Liberty Bond" for bread sold by him in the cities of Pawtucket and Central Falls in the state of Rhode Island, infringes the trade-mark rights of the plaintiff, General Baking Company, in the trade-mark "Bond."

The word "Bond" as a name for bread was first used by the plaintiff about July 10, 1915, in the city of Rochester, N. Y.

April 18, 1916, the plaintiff registered in the United States Patent Office the trade-mark "Bond."

The plaintiff, General Baking Company, owned and operated 24 baking plants in 18 cities, including Rochester, N. Y., and Providence, R. I., and, prior to any use by defendant of the name "Liberty Bond," had used the name "Bond" in Rochester since July 10, 1915; in Buffalo, N. Y., since October 18, 1916; and in three plants in Philadelphia since May 16, 1917.

March 17, 1917, plaintiff's executive committee adopted a resolution:

"That the name 'Bond Bread' be adopted by the company, and that the name be put on in each and all of the plants as soon as expedient."

Though the plaintiff since July, 1915, was operating a baking plant in the city of Providence, it did not until March, 1921, use that name in Providence or in Rhode Island, but marketed its bread under other names.

The defendant began to use the name "Liberty Bond" on August 10, 1917, in a local business in the cities of Pawtucket and Central Falls, and has done no interstate business in connection with that name.

This was about 3½ years before the plaintiff began to use the name "Bond" in Rhode Island. The defendant's first knowledge of plaintiff's claim was in January, 1921, when he received plaintiff's letter notifying him of plaintiff's claim to trade-mark rights in the name "Bond" for bread.

It is a novel and peculiar feature of the case that the plaintiff did not use its trade-mark "Bond" in Providence as a name associated with an old product, but first announced the name in Providence as one that it proposed to use as the name of a new product which it should make after a prize contest among the women of Rhode Island in baking bread.

In advertisements in the Providence Evening Bulletin of March 7, 1921, it was announced that after a prize contest—

"The prize-winning loaves will be taken as a model from which the General Baking Company will produce Bond Bread. This Bond Bread will be offered to the public after the expert bakers analyze the loaves the prize winners submit and copy these ingredients and qualities as modern baking science readily can."

"These prize-winning loaves will be taken as ideals; which the General Baking Company will copy and incorporate in a new loaf of bread to be called Bond Bread."

In an advertisement in the Providence Evening News of March 17, 1921, was announced the result of the contest, stating the selection by experts of 121 prize winning loaves; that the baking experts of the company took these loaves, examined and analyzed them, experimented for many hours, and—

"At last (last Tuesday) Rhode Island received the new Bond Bread, which these housewives had earned for their neighbors, and every day more and more Rhode Island people are adopting the 'child' of these public-spirited women who submitted their home-made loaves."

The full text of plaintiff's advertisements is appended.

There is also evidence as to a similar advertising campaign in other cities.

The defendant contends that the purpose of the plaintiff is plain—to create a local good will as distinguished from a foreign good will for its bread.

If the plaintiff at any time extended to Rhode Island a trade associated with its trade-mark "Bond," it did not do so until 3½ years after the defendant had adopted and used in its local trade in Pawtucket and Central Falls the trade-mark "Liberty Bond."

At the conclusion of the oral testimony at final hearing, including the testimony of the designer of the defendant's wrapper, and the defendant, I found that the defendant adopted and used the word

"Liberty Bond" without knowledge of the plaintiff's use of the mark "Bond," and in good faith and without intention to imitate or profit in any way from any trade reputation of the plaintiff, or to injure or forestall the extension of plaintiff's trade.

From the fact that in January, 1921, the plaintiff by letter notified defendant of its claim of right, it is evident that the plaintiff, when it instituted in Rhode Island its advertising campaign, had knowledge that the defendant Gorman was already using the term "Liberty Bond."

[1] I am of the opinion that there is not in fact any deceptive similarity between the labels of plaintiff and defendant, and that the possibility of confusion is slight. The words "Liberty Bond" are not suggestive of the General Baking Company or of any warranty by that company.

In the advertisement of March 7, 1921, it is said:

"This will be called Bond Bread because it will be guaranteed by the Bond of the General Baking Company, to possess the same pure 'home' ingredients—the same home-made taste—the same crust and the same texture, as the best home-made loaves which your committee of well-known Rhode Island women judges will choose."

The copy of the so-called bond appears in the appendix.

The plaintiff desires that the word "Bond" shall mean the General Baking Company, but such significance could hardly be attached by any one to the term "Liberty Bond," especially when associated, as in defendant's label, with a conspicuous drawing of the Statue of Liberty and a conspicuous statement, "Made by Gorman's Bakery, 679 Dexter St., Central Falls, R. I." It may be said that the dominant feature of defendant's label is the word "Liberty," associated with the Statue of Liberty.

[2] To the defendant's contention that Gorman was first in Rhode Island to associate with a trade in bread the word "Bond" and had acquired a right dating back more than three years before the plaintiff's use, the plaintiff says that "there is no way in which the plaintiff's trade-mark rights could have been territorially limited except by estoppel," and relies upon certain expressions in Hanover Star Milling Co. v. Metcalf, 240 U. S. 424, 36 Sup. Ct. 357, 60 L. Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141.

This contention, however, is unsound. It assumes that general rights are created by the mere adoption of a trade-mark in a local trade, and that this right can be asserted in territory to which the trade has never been extended unless by his conduct the proprietor has estopped himself against a defendant who has expended money in building up a business in reliance upon the failure of the plaintiff to enter his field.

In the present case, as in United Drug Co. v. Rectanus, the use of the trade-mark had been confined to a limited territory. In another territory to which the trade had not been extended, an innocent party in good faith, and without notice of any prior use, selected a mark and built up a local trade. There was no knowledge of a prior trade associated with the trade-mark, and therefore no reliance upon any representation by the first user.

Estoppel to assert a legal right must arise from some inequitable or misleading conduct. A mere failure to extend trade does not estop one from any right which he has acquired in the trade in the territory where the trade-mark means his goods.

The decisions cited relate to the question of acquiring rights in a trade-mark, and hold specifically that the question of priority of appropriation of a trade-mark may be legally insignificant in a case like the present. The question is whether the prior appropriator of the mark had acquired any rights in the territory of the later user.

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed."

See Ammon & Person v. Narragansett Dairy Co., Ltd. (C. C. A.) 262 Fed. 886, and citations therein from United Drug Co. v. Rectanus, 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141.

It is erroneous, therefore, to infer that the decisions of the Supreme Court rest upon principles of estoppel. While it is true that in United Drug Co. v. Rectanus Co., 248 U. S. at page 103, 39 Sup. Ct. at page 53 (63 L. Ed. 141), it is said "petitioner is estopped to set up their continued use of the mark in that territory as an infringement of the Regis trade-mark," it is manifest that the Supreme Court did not hold that the petitioner had acquired any rights which he was estopped to assert, but that the trade-mark gave no right to protection in advance of the extension of the trade.

"But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like."

While this paragraph seems to recognize that a proprietor of a trade-mark is not without a right to protection against intentional interference with the natural expansion of his trade and to protection against trade imitation in an attempt by others to profit by the reputation of what he has originated, this record presents no question of that character.

"The commercial impression of a trade-mark is derived from it as a whole not from its elements separated and considered in detail." Beckwith v. Commissioner of Patents, 252 U. S. 538, 40 Sup. Ct. 414, 64 L. Ed. 705.

[3] It is true that a part of a trade-mark may become so significant or conspicuous as to make it a "dominant feature," imitation of which is in effect imitation of the entire mark, or of its trade-name or nickname.

"Queen" and "Queen of the West." Ammon & Person v. Narragansett Dairy Co. (D. C.) 252 Fed. 276; Id. (C. C. A.) 262 Fed. 880; Gordon's Dry Gin Co. v. Eddy & Fisher Co. (D. C.) 246 Fed. 954.

A finding of a similar word in two trade-marks, however, does not establish the fact that this is a "dominant feature."

When Gorman and his label designer chose for bread the name "Liberty Bond," they employed one of the most familiar and best advertised terms; a term associated with appeals to patriotism and with patriotic sentiment. They emphasized this sentiment by the picture of the Statue of Liberty enlightening the world. They then joined this term with the word bread, "Liberty Bond Bread," with the same rhetorical sense that formerly had led to the name "Washington Pie."

To a public so familiar as the citizens of Pawtucket and Central Falls with the patriotic sentiments already attached to the words "Liberty Bond," and so entirely uneducated as to the advertising intentions of the General Baking Company, Mr. Gorman appealed by his bread wrapper, associating this familiar name with his bread as an appropriate designation for what he described as:

"The best bread made, made clean, baked clean, sold clean. Made by Gorman's Bakery, 679 Dexter St., Central Falls, R. I."

An analysis which disregards all of this except only the word "Bond," in order to find a resemblance between the plaintiff's trade-mark and the defendant's, seems a fallacious method of comparison, which does not result in the establishment of the word "Bond" as the dominant feature of defendant's trade-name.

[4] Unlike the plaintiff, Gorman does not even suggest that he offers his own bond as a warranty of the quality of his product.

Assuming that the plaintiff had in some localities associated the word "Bond" with the General Baking Company and with the machine engraved green border of its so-called bond, and with bread made in other cities, it is apparent that no such meaning had been created in the minds of the citizens of Rhode Island when Mr. Gorman chose his trade-name.

The bread made at the Providence plant of the General Baking Company, prior to its advertising of the new bread, was given other names,

The plaintiff, who began in this territory, 3½ years afterwards, to create a reputation for a new bread and to give a new and local significance to the word "bond," has in my opinion shown no legal or equitable right upon which his bill can be sustained.

The bill will be dismissed.

### APPENDIX.

(Copied from the Evening Bulletin, March 7, 1921.)

You May Win Part of That $1,000.

You Will Surely Get Two Loaves For The One You Submit In The Bond Bread Baking Contest, At Providence Y. W. C. A., March 12th.

Make up your mind now that you will bake a loaf of bread and submit it on Saturday morning March 12th.

You may very well be one of the 121 women who will win prizes amounting to $1,000.

If you are a good cook, if you are proud of your bread, the General Baking Company wants you to show them your ideal of what a perfect loaf of bread should be. That is why they have offered these generous money prizes to the women of Rhode Island.

Every contestant will at least get (free) two loaves of the new wrapped bread which the General Baking Company will pattern after the prize-winning home-made loaves.

This will be called Bond Bread because it will be guaranteed by the Bond of the General Baking Company, to possess the same pure "home" ingredients—the same home-made taste—the same crust and the same texture 'as the best home-made loaves which your committee of well-known Rhode Island women judges will choose.

How Rhode Island Women Will Select the 121 Winners at Y. W. C. A.

As each loaf of bread is received, its wrapper—containing the contestant's name—will be marked with a number corresponding to a ticket, which ticket will be pinned on her loaf.

Promptly at 2 o'clock, Saturday, March 12th, loaves will be spread out on tables. Each loaf will be identified by its number. The names of the contestants will be concealed from the judges.

The Committee of Judges will then pick out the 121 best loaves from all of those submitted. The women who will do this are unbiased and thoroughly representative of this vicinity. They are well-known local women who are giving their time (without compensation) to the judging of this contest. Their only reason for doing this is the possibility that the contest may result in bringing about better bread for the people of Rhode Island and vicinity.

The Judges will be asked to select the 121 best loaves of bread on the basis of the following six qualities: General appearance; volume (size in proportion to weight); texture (fluffiness); color (inside of loaf); bake; flavor.

The prize-winning loaves will be taken as a model from which the General Baking Company will produce Bond Bread. This Bond Bread will be offered to the public after the expert bakers analyze the loaves the prize-winners submit—and copy their ingredients and qualities as modern baking science really can.

\* \* \* \* \* \* \* \* \*

These prize-winning loaves will be taken as ideals; which the General Baking Company will copy and incorporate in a new loaf of bread to be called Bond Bread.

In their clean, sunlit bakeries (so highly praised by pure food authorities) it is possible to make any kind of bread. They want to know what kind of bread you—the women of this vicinity—like best, so that they may duplicate that bread for you.

\* \* \* \* \* \* \* \* \* \*

(Copied from the Providence News, March 17, 1921.)

3166 Women Earned Bond Bread for Rhode Island.

The most fascinating chapter in bread-history was written in Providence last week, when the General Baking Company gathered together the home-skill of 3166 local housewives and combined that skill into a new loaf—called Bond Bread—the most nutritious and the most delicious loaf ever perfected.

Instead of doing the usual thing—instead of saying to Rhode Island housewives:—"Here's what we bakers think is good bread, eat it"—Instead of that these Bakers said:—

"Mrs. Housewife—you prefer the bread you make at home. Please bake a loaf and show it to us. We will match your loaf. We will make bread your way. We can do this, because we will use the very same ingredients you use, under scientific conditions, which will enable us to control humidity and temperature better than you can."

And this was the housewives' response:

"Make it my way—I am tired of baking."

And so, on March 12th, 3166 women submitted their home-made loaves at the Providence Y. W. C. A. and thus really earned Bond Bread for all Rhode Island.

That afternoon, impartial experts (well-known Rhode Island women in no way connected with the bakeries) analyzed the home-made loaves, and selected the 121 prize loaves.

These bread judges were headed by Miss Claribel Nye, Bread Specialist of Cornell University. They all worked without compensation. Their only motive, was to help Rhode Island win better bread—the new Bond Bread—combining the home-skill of Rhode Island women.

Then the baking experts took the 121 prize-winning loaves. They examined them. They analyzed them.

They experimented for many hours.

At last (last Tuesday) Rhode Island received the new Bond Bread, which those housewives had earned for their neighbors. And every day, more and more Rhode Island people are adopting this "child" of those public-spirited women who submitted their home-made loaves.

\* \* \* \* \* \* \* \* \* \*

Here are some of the reasons why Bond Bread has captivated Rhode Island women—

"I use Bond Bread because it has that real home-made flavor."

"I buy Bond Bread because it is so evenly textured that it slices thinly and without waste."

"I buy Bond Bread because my children will be content with no other bread, since they have tried Bond Bread."

"I insist on Bond Bread because I like to know what we eat, and Bond Bread's ingredients are fully listed on each loaf, and guaranteed under the bakery's bond. This bond is what gives Bond Bread its name."

\* \* \* \* \* \* \* \* \* \*

But many Rhode Island women insist on Bond Bread without knowing just why. Some feel that "Bond Bread is more digestible." Fact is that the new Bond Bread is more digestible than the best of those home-made loaves.

Likewise, Bond Bread is more nutritious. Not only are its pure ingredients the same as used in the home-made bread submitted—

But—analyses of the great chemists prove that, in nutrition and digestibility, Bond Bread marks a new era in bread-making.

But Purity is the greatest boon that those housewives earned for Rhode Island by making Bond Bread possible.

It is this purity that is insured by the Bond from which Bond Bread gets its name. It is this purity which makes Bond Bread the favorite of every mother who wants to know what her children are eating. They do know when they eat Bond Bread because this Bond is their guarantee.

Know all men by these presents that

General Baking Company

is held and firmly bound unto the Purchaser of this loaf of

Bond Bread.

Trade-Mark Reg. U. S. Pat. Off.

and hereby warrants that the loaf of Bread contained within this Germ-Proof and Dust-Proof Wrapper is made from the following Pure Food Materials, and no other ingredients of any kind:

Best Wheat Flour, Compressed Yeast, Pure Filtered Water, Best Fine Salt, Pure Lard, Granulated Sugar and Condensed Milk.

General Baking Company.

On every loaf is this Bond, from which Bond Bread is named.

Bond Bread.

Made as the Housewives showed us.